**RED TOP GAS, INCORPORATED, a Missouri Corporation, Appellant,**

v.

**DALE HENSLEY AND FRED HAWKINS, a Partnership doing business Under the Firm Name of *Mountain Grove Gas Co.*; Mountain Grove S. P. Gas Company, Inc., a Missouri Corporation; Super Petroleum Corporation, a Missouri Corporation; Super Propane Corporation, a Missouri Corporation; and Warren Petroleum Corporation, a Foreign Corporation, Respondents.**

No. 53976.

Supreme Court of Missouri,
Division No. 1.

April 14, 1969.

Motion for Rehearing or to Transfer to Court En Banc Denied May 12, 1969.

William Duke Hiett, Houston, M. J. Huffman, Hartville, for plaintiff-appellant; Hiett & Becker, Houston, of counsel.

Donnelly, Baldwin & Wilhite, David Donnelly, James E. Baldwin, David E. Wilhite, Lebanon, for defendants-respondents, Mountain Grove S. P. Gas Co., Inc., Super Petroleum Corp., Super Propane Corp. and Warren Petroleum Corp.

HOUSER, Commissioner.

Action by Red Top Gas, Incorporated, under the Bulk Sales Law, Chapter 427, RSMo 1959, V.A.M.S., against Dale Hens-

ley and Fred Hawkins, a partnership d/b/a Mountain Grove Gas Co.; Mountain Grove S. P. Gas Company, Inc., and three successor corporations, alleging that Red Top sold and delivered to defendants gas and gas tanks and loaned to them a number of gas cylinders to be returned; that defendants made payments on the merchandise and tanks, leaving a balance due of $9,873.08; that 176 gas cylinders worth $2,137.50 had not been returned; that on June 26, 1962 the partners sold their business in bulk to Mountain Grove S. P. Gas Company, Inc., which in turn sold it to the defendant successor corporations, which did not comply with the Bulk Sales Law, Chapter 427, RSMo 1959; that the sale was fraudulent, null and void against Red Top; that by failing to notify Red Top of the sale vendees became accountable to Red Top for the merchandise and gas cylinders. Red Top prayed for judgment against the partners for $12,010.58; that the sale and transfer be declared void against creditors of the partnership, including Red Top; that the purchasers and successor corporations be appointed receivers of the property and that it be sold and the proceeds applied to the partners' debt to Red Top. Except for formal admissions the successor corporations denied generally. The partners and defendant Mountain Grove S. P. Gas Co., Inc. alleged return of all gas cylinders, full payment of all accounts and that the sale was not fraudulent, null or void.

■ The case was referred. The referee found that Red Top had prior knowledge of the proposed sale; that all of the purchase money paid by the corporate purchaser was paid over to the creditors of the partnership; that Red Top accepted $17,000 thereof; that the matter of the cylinders was settled by a collateral agreement between the parties; and that Red Top is estopped to claim invalidity of the sale of the partnership business under the Bulk Sales Law because it accepted and retained the proceeds of the sale with full knowledge that the business was being sold. Exceptions were overruled. The court con-

firmed the referee's report. Judgment was rendered accordingly, dismissing Red Top's petition as to the corporate defendants and awarding Red Top a judgment for $9,873.08, with interest, against the individual partners. Red Top appealed from the judgment. The total amount in dispute, including interest, is $15,691.28, so this Court has jurisdiction.

In September, 1960 and prior thereto Dale Hensley and Fred Hawkins, partners supplying propane gas, were purchasing their gas, gas tanks, fixtures, etc. from Red Top. By April, 1961 the outstanding account had risen to nearly $11,000. The partners, under-capitalized and running short of cash, were having trouble paying their debts to Red Top. Red Top's president, Gilbert Roberts, was concerned about the size of the debt. He discussed the matter with representatives of the partnership. It was agreed that a second account be started, on a C. O. D. basis. The partners stayed on a cash basis for a while but later fell behind on the second account, which eventually reached an amount exceeding $15,000.

In December, 1961 Rex Shaddox, vice-president of Super Propane Corporation and director of Mountain Grove S. P. Gas Company, Inc. approached Roberts to discuss the possible purchase of the Red Top corporation. In the course of the conversation Roberts told Shaddox that he understood that the business of the partnership "could be bought." Shaddox knew that Red Top was the gas supplier of the partnership. Shaddox visited with the partners. A week later Roberts and Shaddox had another talk on the subject. On February 26, 1962 the partners entered into an agreement giving Super Propane Corporation, its successors and assigns, an exclusive option to purchase the partnership business. The agreement provided that the sale comply with the Bulk Sales Law. Roberts knew that Super Propane Corporation had an option to buy the partnership, and that "they were investigating it." At no time did Roberts, or anyone else on behalf of

Red Top, take any steps to secure or collect the partnership account other than to discuss payment with the partners. Roberts discussed the sale of the partnership business with the partners five or six times.

On March 3, 1962 the contract to purchase the partnership business was executed. Before it was signed that day Shaddox drove to Cabool and talked to Roberts, who indicated that he would be highly pleased if Shaddox's company would buy the partnership business. According to Roberts he told Shaddox that the partnership owed him $25,000 or $26,000. According to Shaddox Roberts fixed the debt at "almost $20,000" for purchases, including 450–500 gas cylinders on loan, and informed Shaddox that the partnership account had been placed on a C. O. D. basis and that he owned the cylinders. Roberts agreed to take the cylinders back as they came in in the normal course of business and issue full credit for the cylinders, without obligation on the part of the purchaser "to continue with it." After March 3 Shaddox had several telephone conversations with Roberts in which Roberts was informed with respect to the existence of the contract to purchase the partnership business and Shaddox's intention to complete the purchase. Shortly before June 26 Shaddox called Roberts and informed him that they were continuing with the transaction and were consummating the sale; that all that was left to do was to verify the number of gallons the partners had sold during the years previous to the sale date. He asked for and obtained permission from Roberts to have a firm of auditors go over Red Top books. The audit was accomplished ten days or two weeks before the date of the sale. Red Top cooperated with the auditor in the examination of its books for this purpose. There was no attempt by Shaddox to conceal from Red Top that these negotiations were in progress or Shaddox's intentions. On the contrary, at all times during the negotiations Roberts was kept posted and had knowledge of what was going on with regard to the sale of the partnership business.

On June 26, 1962 a sale was completed by which the partners sold all of the partnership business and assets known as Mountain Grove Gas Co. to Mountain Grove S. P. Gas Company, Inc. for $62,000. Roberts did nothing to stop the sale "from going through." No attempt was made to comply with the provisions of the Bulk Sales Law and there was no written waiver of the provisions of Chapter 427 under the proviso of § 427.020. On June 26, 1962 the partnership debt to Red Top was $26,873.08. The partnership owed many other creditors. The sales price of $62,000 was disbursed to the various creditors. A check for $17,000 payable jointly to the two partners and Red Top Gas Co. was issued and delivered to Red Top. Roberts did not refuse the check. He was glad to get it. At the time Roberts deposited the check he called the bank to see if it would clear. The partnership account was credited with $17,000 on Red Top books. Roberts testified that Red Top's officers and agents were "led to believe that there would be more to follow" but this was not explained or substantiated. It was some time after the check cleared the bank that Roberts notified Shaddox that Red Top claimed an additional $9,873.08. At no time did Roberts offer to return or tender the $17,000 on condition that the sale be set aside so that he could receive additional monies.

On this appeal Red Top claims that the sale of the partnership business was fraudulent and void because of noncompliance with the Bulk Sales Law; that Red Top is not estopped to assert its claim for the balance of the debt owed to it by the partnership and for conversion of gas cylinders because it made no admission or statement and committed no act inconsistent with its claim for the balance due on the account; that the purchaser, knowing that the Bulk Sales Law was not complied with, is liable to Red Top for the balance due; that the purchaser's successor corporations, which acquired the stock and assets to which the cylinders were transferred, are also liable to Red Top for the balance due

on the account and the value of the cylinders.

The corporate defendants insist that Red Top is estopped to assert the invalidity of the sale because of noncompliance with the Bulk Sales Law and that there is no monetary liability on their part for the debts of the partnership.

■ The right to the benefit of bulk sales statutes may be waived and creditors may be estopped to make claim thereunder where they consent to, or acquiesce in, a bulk sale. 37 Am.Jur.2d Fraudulent Conveyances § 266, citing In Re Gill-Owen Co., 7 Cir., 204 F.2d 520, cert. den. 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391; Nokes v. Wade, 243 Iowa 1288, 55 N.W.2d 187; Evans v. Herbranson, 241 Iowa 268, 41 N.W.2d 113, 15 A.L.R.2d 925; Gwinn Bros. & Co. v. Peoples General Store, 269 Ky. 813, 108 S.W.2d 1001; United States Rubber Co. v. Ball, La.App., 153 So.2d 203; Coffey v. McGahey, 181 Mich. 225, 148 N.W. 356; Ogdensburg Wholesale Mercantile Co. v. Curry, 148 Misc. 806, 266 N.Y.S. 222, affd. without op. 241 App.Div. 786, 270 N.Y.S. 1018; First Bank of Texola v. Terrell, 44 Okl. 719, 145 P. 1140; Branham v. Jackson, 12 Utah 2d 399, 367 P.2d 187; State Bank of Viroqua v. Jackson, 261 Wis. 538, 53 N.W.2d 433; Anno. 15 A.L.R.2d 939, § 2.

■ On these facts the creditor Red Top has waived its right to avoid and is estopped to assert the invalidity of the sale on the ground of noncompliance with the Bulk Sales Law, and therefore the dismissal of the petition as to the corporate defendants must be upheld insofar as the validity of the sale is concerned. Red Top's president first suggested to the purchaser's representative the possibility that the partnership business was for sale and enlisted his interest. He encouraged the purchaser's representative to buy the business. When the option to purchase was obtained, and when thereafter the contract of sale was executed, he was informed of the facts. He was later told that the consummation of the contract of sale was imminent; that the only thing left to do was to confirm representations by the sellers of the volume of gas sold. At the request of the prospective purchaser Red Top's president permitted the examination and audit of its books to determine the volume of gas sold by Red Top to the partners and cooperated in the conduct of the audit. Although Red Top's president knew that the partners were in financial straits during this entire period and that a sale in bulk of all of the assets of the debtors was contemplated, no efforts were made to secure Red Top's claims or to protect its interests. When the sale was consummated Red Top's president did not object, but on the contrary approved, and when Red Top received $17,000 from the proceeds of the sale he gladly accepted, retained and cashed the check. By accepting the benefits of the sale Red Top's president ratified the sale and transfer and Red Top is estopped to disavow the sale as invalid for failure to be notified under the Bulk Sales Law (of facts of which Red Top already had full knowledge). Red Top is in the inconsistent and untenable position of affirming the sale to the extent that it received benefits therefrom while at the same time seeking to invalidate the sale to the extent of the deficiency in the full satisfaction of its claims. As to that deficiency it seeks to exclude the general creditors and obtain a preference for the balance of its claim by way of a lien on the property for noncompliance with the Bulk Sales Law, without offering to return the $17,000 it received out of the proceeds of the sale. A creditor will not be allowed thus to blow hot when it is to its advantage and cold when it is to its disadvantage. "To permit them to thus gain what advantages could be had by reason of the transfer and then later assert a claim to the property thus transferred because of a failure to give notice under the Bulk Sales Act would permit the Bulk Sales Act to become an instrument of fraud rather than one of protection of creditors." In re Gill-Owen Co., 7 Cir., 204 F.2d 520, 523. The general principle that when he who is

entitled to avoid a sale stands by and watches the title pass without acting in defense of his own interests and ratifies the transfer by taking the first proceeds of the sale he will not be permitted to later question the validity of the sale as a fraud upon his rights was applied in Milan Bank v. Richmond, 280 Mo. 30, 217 S.W. 74, 9 A.L.R. 353. Although not involving the Bulk Sales Law this case in a fairly comparable situation applies the principle of estoppel, sometimes called ratification, namely, that " [w]here one having the right to accept or reject a transaction takes and retains benefits thereunder, he becomes bound by the transaction and cannot avoid its obligation or effect by taking a position inconsistent therewith." The principle that a creditor who acquiesces in or accepts benefits under a transaction which is fraudulent as in violation of a Bulk Sales Law will not thereafter be heard to assert the invalidity of the transfer has been applied in the following cases: In re Gill-Owen Co., supra; In re Central Metallic Casket Co., D.C.Wis., 170 F.Supp. 320; Kinney v. Yoelin Bros. Merc. Co., 76 Colo. 136, 230 P. 127; In re Scranton & Short, Inc., D.C.Or., 7 F.2d 473. In the latter case the court said, 7 F.2d, l. c. 474: "The bank had ample notice and knowledge that the sale was to be made. Its cashier was in touch with both Scranton and Short at the time, and was well advised of the conditions of the project, and approved it, being of the view that it was a good business venture, and would enable Scranton to meet his obligations. Such being the case, the bank cannot now insist that the Bulk Sales Law * * * was not complied with, to its disadvantage."

In addition to the allegations of the supplemental petition by which Red Top sought to impeach the sale there was the further allegation that defendants failed to return to Red Top 171 gas cylinders which it had loaned to the partnership and which had come into the possession of the purchaser and its successor corporations.

The petition alleged that 520 gas cylinders were loaned to the defendants under a Cylinder Responsibility Agreement which provided for their return; that 171 cylinders, of the value of $12.50 each, had not been returned and that there was due Red Top for unreturned cylinders the sum of $2,137.50. The evidence on this issue indicated that before the contract of sale was entered into the purchaser's representative and Roberts as president of Red Top agreed that the cylinders would be returned to Red Top in the normal course of business. After August 13, 1962, the date of the filing of this action, counsel for the parties made the same agreement and that the cylinders "would not be a part of this lawsuit" if returned "in due course of time," and "in a six-months' period they were to be paid for." As of November 1, 1962 the number of unreturned cylinders had dropped from 337 to 126. In a deposition given on that date Roberts, referring to the agreement, testified that "the way it [was] working" the cylinders were not a vital issue in the lawsuit. At the trial Roberts, while admitting that the agreement was still in force and effect, indicated that he considered four years a reasonable period of time within which to account for the cylinders.

No cylinders have been returned since November 1, 1962, so the number of cylinders still remaining unaccounted for stands at 126. The evidence shows that they were of the value of $12.50 each. The referee merely found that an agreement was entered into for the return of all of the loaned cylinders that came into defendants' possession in the normal course of business. He made no recommendation that Red Top be allowed compensation for unreturned cylinders or that the corporate defendants be required to return any outstanding cylinders. The circuit court, confirming the referee's report, made no such allowance or requirement.

The corporate defendants take the position that the agreement is still in force and effect; that the issue with respect to the

cylinders is no part of the lawsuit, and that there is no support, either in the pleadings or evidence, for Red Top's theory that the corporations converted property which was the subject of a bailment.

■ We are not so persuaded. The subject matter, the loan and the agreement stand admitted. This is a classic case of bailment. That 126 cylinders remain unreturned is tacitly admitted by the corporate defendants. Neither the purchasing corporation nor its successors introduced any evidence to show that any of the 126 cylinders had been returned or why the corporate defendants should be excused from accounting for them, other than the agreement that they would not be a part of the lawsuit. As indicated, the condition of that agreement was not met. Red Top has a right to insist upon the return of the 126 cylinders or their value. There was no basis in the evidence upon which the referee could have denied Red Top's claims with reference to the cylinders, and the circuit court erred in confirming the referee's report disallowing damages on this account.

Accordingly, the judgment of the circuit court of November 22, 1966 is reversed and the cause is remanded with directions to enter a new judgment as of November 22, 1966 setting aside the referee's findings and conclusions with reference to the gas cylinders; setting aside the dismissal of the petition as to the corporate defendants insofar as their liability to account for the gas cylinders is concerned, and awarding judgment for plaintiff and against the corporate defendants in the sum of One Thousand Five Hundred Seventy Five Dollars ($1,575.00), together with interest thereon at the rate of 6% per annum. In all other respects the new judgment will follow the judgment of November 22, 1966 in terms as originally entered.

WELBORN and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

HENLEY, P. J., SEILER, J., and MOORE, Special Judge, concur.

STORCKMAN, J., not sitting.